

FILED
Jan 06, 2021
10:17 AM(CT)
TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD

**TENNESSEE BUREAU OF WORKERS' COMPENSATION**
**WORKERS' COMPENSATION APPEALS BOARD**

| | | |
|---|---|---|
| Angel Smith | ) | Docket No.     2018-05-1098 |
| | ) | |
| v. | ) | State File No.   894-2018 |
| | ) | |
| TrustPoint Hospital, LLC, et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Robert V. Durham, Judge | ) | |

---

### Affirmed and Remanded

---

In this interlocutory appeal, the employer asserts the trial court erred in ordering it to provide additional medical benefits as recommended by the authorized treating physician, arguing that the need for additional surgery arose primarily from the employee's pre-existing medical condition. The employer further asserts the trial court erred in awarding temporary partial disability benefits pending a final determination of maximum medical improvement or the employee's return to work. Upon careful review of the record, we affirm the trial court's order and remand the case.

Presiding Judge Timothy W. Conner delivered the opinion of the Appeals Board in which Judge David F. Hensley and Judge Pele I. Godkin joined.

Marcia Dawn McShane, Nashville, Tennessee, for the employer-appellant, TrustPoint Hospital, LLC

R. Stephen Waldron, Murfreesboro, Tennessee, for the employee-appellee, Angel Smith

### Factual and Procedural Background

Angel Smith ("Employee") worked as a certified nursing assistant at a medical facility operated by TrustPoint Hospital, LLC ("Employer"). On December 31, 2017, Employee was helping a nurse move a patient when she felt a pop in her left shoulder. She reported the incident to Employer and received emergency care at a local hospital. Thereafter, she was evaluated by Dr. Frank Thomas at Concentra, who prescribed medications and ordered physical therapy and an MRI of her shoulder. Dr. Thomas noted in his January 4, 2018 report that Employee was "not tolerating therapy well." He

diagnosed left shoulder impingement syndrome and recommended a referral to an orthopedic specialist.

The left shoulder MRI was interpreted as revealing "rotator cuff tendinosis/tendinopathy" with "minimal partial-thickness articular surface and bursal surface tears." In his January 16 note, Dr. Thomas reiterated his request for a referral to an orthopedic specialist. Employer provided a panel of orthopedic physicians, from which Employee selected Dr. Kyle Joyner with Tennessee Orthopedic Alliance.

Employee first saw Dr. Joyner on February 7, 2018. Following his initial evaluation and review of diagnostic reports, Dr. Joyner diagnosed left shoulder pain "with presumptive aggravation of the AC joint, with a component of underlying impingement." He injected medication into Employee's shoulder and prescribed an additional course of physical therapy. During a March 6 visit, Employee reported no significant improvement with the previous injection or continued therapy. Dr. Joyner discussed the possibility of surgical intervention and Employee agreed.

On March 9, 2018, Employer's utilization review ("UR") provider issued a report in which it declined to certify the requested surgery after the reviewing physician opined that objective findings did not support a conclusion that Employee had exhausted conservative treatment options. However, according to Dr. Joyner's May 1, 2018 report, authorization for the surgery was eventually obtained, and he performed the surgery on May 7.

Following surgery, Dr. Joyner prescribed another course of therapy, but Employee attended only two of five appointments. In a June 17 discharge summary, the therapist noted decreased range of motion, weakness, and difficulties with lifting, reaching, and activities of daily living. However, in his June 19 report, Dr. Joyner noted good range of motion in the left shoulder and "good clinical function" in the rotator cuff. Due to "residual pain," Dr. Joyner offered an injection, which Employee received. Dr. Joyner noted he was transitioning her to a home exercise program.

On July 1, 2018, Employee was seen at St. Thomas Rutherford Hospital's emergency room complaining of severe shoulder pain at her incision site. X-rays did not reveal any evidence of fracture or dislocation. The attending physician diagnosed "post-surgical complications" and released her with a recommendation to follow up with her treating physician. Upon her return to Dr. Joyner on July 5, Employee complained of persistent shoulder pain but no radicular pain. Dr. Joyner noted "[s]he does have some longstanding numbness and tingling in the hand secondary to carpal tunnel that is unchanged," but she had no complaints of neck pain. Dr. Joyner ordered another MRI of the shoulder.

The July 7 left shoulder MRI revealed "[s]mall partial-thickness bursal and articular surface tears" with rotator cuff tendinosis. The MRI report also noted "[s]evere AC joint osteoarthropathy with surrounding inflammation and AC joint effusion." In a July 18 report, Dr. Joyner noted the MRI findings, which he felt were consistent with post-surgical inflammation. He injected Employee's shoulder with a pain medication and documented her work restrictions. When she returned with persistent pain on August 21, Dr. Joyner again offered her an injection and noted that "[i]f her pain does not improve, we may give consideration to further intervention."

During the next visit on September 18, 2018, Dr. Joyner discussed additional surgery due to "persistent pain in the AC joint." He recommended proceeding with an "open AC joint left shoulder decompression and possible interposition." Employer submitted this request to its UR provider and, in a report dated September 21, 2018, the reviewing physician recommended the surgery not be certified. The reviewing physician concluded there were "limited objective findings to support the request for surgery" and that "[q]uantifiable [range of motion] and provocative testings were not presented." The UR non-certification was appealed to the Tennessee Bureau of Workers' Compensation's Medical Director's office, where it was reviewed by Dr. James Talmage. In an October 8, 2018 letter, Dr. Talmage upheld the UR denial but suggested that the treating physician:

> [R]esubmit this care to Utilization Review documenting presence of rheumatologic disease, and what joints are active, labs for inflammatory disease, re-examination during pharmacologic activity of local anesthetic injection into AC joint area, and documentation of psychiatric status.

There is nothing in the record indicating that Dr. Joyner re-submitted the recommended surgical treatment to UR. In his October 17 report, Dr. Joyner reiterated his recommendation for surgery because "[c]onservative care to this point has failed regarding continued pain in the AC joint."

On February 18, 2019, Dr. Joyner responded to a questionnaire from Employee's attorney by stating he had not had the opportunity to review previous diagnostic test results or make a comparison of pre-accident and post-accident MRIs of the left shoulder. He explained he could not provide an opinion regarding permanent impairment but stated he believed Employee had reached maximum medical improvement ("MMI"). He further noted that permanent restrictions would be addressed through a functional capacity evaluation ("FCE") and that permanent impairment would be addressed after completion of the FCE. He also provided the following causation statement: "[G]iven her history, it is likely that her most recent injury has exacerbated the condition of her shoulder necessitating further treatment at this time."

3

Thereafter, an FCE was completed on March 20, 2019, which indicated Employee was capable of functioning in the sedentary physical demand category. The therapist noted that Employee gave "acceptable/good effort" and that her pain profile was "moderate to high." In his subsequent April 2 report, Dr. Joyner commented that the FCE was "a reliable evaluation." He adopted the restrictions outlined in the FCE and released Employee from active care, indicating she could return "as needed." In a final medical report dated April 23, 2019, Dr. Joyner assigned a five percent permanent medical impairment rating.

On April 11, 2019, Employee was seen by Dr. Gary Margolies for complaints of back pain and hip pain, apparently related to rheumatoid arthritis. Dr. Margolies noted that Employee's case was "hard to assess" in that Employee had "residual pain but no swollen or tender joints today." He diagnosed rheumatoid arthritis, osteoarthritis, lumbar disc degeneration, and lumbar radiculopathy, among other diagnoses.

On December 17, 2019, Employee returned to Tennessee Orthopedic Alliance and was seen by a physician's assistant rather than Dr. Joyner. The physician's assistant documented that Employee reported becoming entangled in a dog leash on December 12, causing her to fall backward and land awkwardly on her right shoulder. She specifically denied any aggravation of her left shoulder associated with this fall. The physician's assistant ordered an MRI and recommended Employee follow up with Dr. Joyner after that test. No such follow-up report is contained in the record.

On March 4, 2020, Employee was evaluated by Dr. Damon Petty, also with Tennessee Orthopedic Alliance, at Employer's request. In his Independent Medical Evaluation report, Dr. Petty summarized Employee's medical history and prior surgical treatment. He conducted a physical examination and noted Employee's pain complaints were "quite excessive and beyond normal." He also noted inconsistencies in her range of motion during distracted testing versus non-distracted testing. In his report, Dr. Petty opined that Employee had sustained an aggravation of rotator cuff tendinitis but that her rotator cuff was intact and functional. He felt she exhibited signs of symptom magnification and inconsistencies in range of motion testing. He offered several differential diagnoses, including adhesive capsulitis, a painful AC joint, and symptom magnification but concluded he "cannot make a determination based on the facts that are laid out before me." Finally, he stated in his report that "further surgery on her left AC joint would not be required by her work-related injury in December 2017 because her AC joint had preexisting pathology that was not affected by the injury."

Employee returned to Dr. Joyner on July 1, 2020, complaining of persistent pain and functional limitation in her left shoulder. Dr. Joyner noted "maximal tenderness" around the AC joint with "clinically intact" rotator cuff function. Dr. Joyner again discussed the possibility of surgical intervention, but he noted Employee "is awaiting final disposition regarding her Workers' Compensation case."

4

Employee filed a petition for benefit determination and a request for an expedited hearing. In preparation for the expedited hearing, Employee deposed Dr. Joyner, and Employer deposed Dr. Petty. During Dr. Joyner's December 9, 2019 deposition, he testified that diagnostic testing completed after the work accident revealed arthritic changes in the AC joint and "a significant rotator cuff injury." He explained that following his initial evaluation, he diagnosed Employee with aggravation of her AC joint "with a component of underlying impingement." He described the conservative care he prescribed and his eventual surgical recommendation, which was approved by Employer's insurer. He testified that during the surgery, he confirmed the pre-operative diagnoses and "cleaned up" the labrum arthroscopically. Dr. Joyner expressed his opinion that Employee "had some arthritis in the AC joint that was exacerbated by [the work] injury, and she had a low-grade tear of her rotator cuff." He also opined that the aggravation of her pre-existing arthritis was "primarily related to . . . the work activity."

According to Dr. Joyner's deposition testimony, following the May 2017 shoulder surgery, Employee continued to complain of persistent pain. Over the next several months, she reported no improvement with therapy. Thereafter, Dr. Joyner ordered another MRI that revealed inflammatory changes in the AC joint. He gave Employee another injection and recommended she continue her home exercise program. In September 2018, after additional conservative care failed to improve her symptoms, Dr. Joyner discussed the possibility of another surgical procedure. Dr. Joyner testified that after authorization for the additional surgical procedure was denied, he filed an appeal "[b]ecause [he] felt that the surgery was indicated and that it . . . was related to the process of her injury." He further indicated a willingness to perform the additional surgery as of the date of his deposition testimony.

Addressing the opinion of the UR reviewing physician stating there was insufficient evidence of the failure of conservative treatment to support certification of the recommended surgery, Dr. Joyner testified as follows:

> We characterized her pain multiple times throughout the process of evaluation. She had multiple visits with physical therapy documenting her range of motion. We discussed the physical examination findings, including direct tenderness of the AC joint, cross body testing. And she had undergone physical therapy. Had been treated with anti-inflammatories, pain medication and injection, and a lidocaine injection test. . . . [A]nd we had an MRI also confirming residual pathological changes at the AC joint.

Dr. Joyner testified that, in his opinion, the recommended surgery was medically necessary, and the "primary cause" of the need for the additional surgery was "the work injury." Finally, Dr. Joyner noted that if further surgical treatment was authorized, "her MMI date would be adjusted pursuant to completion of treatment."

During cross-examination, Dr. Joyner was asked about Employee's prior history of shoulder problems. He acknowledged that diagnostic studies pre-dating the work accident could be helpful in determining whether the work injury caused an anatomic change in her shoulder. After reviewing the report from a 2012 MRI of Employee's left shoulder, as well as the operative report from a 2012 surgery, Dr. Joyner agreed there was evidence of pre-existing arthritis in the left shoulder AC joint in 2012. However, Dr. Joyner also noted that Employee had reported a good result from the 2012 surgery and had experienced a resumption of normal work activities until the 2017 work accident. He had received no records to suggest any left shoulder complaints or treatment in the intervening period between her recovery from the 2012 surgery and the 2017 work accident.[1] Dr. Joyner maintained that the December 2017 work accident caused a partial-thickness tear of the rotator cuff and an aggravation of her pre-existing arthritis.

During Dr. Petty's July 29, 2020 deposition, he summarized the results of his independent medical examination and reiterated the opinions expressed in his report. He noted a 2012 MRI that revealed Employee's "AC joint was already arthritic," and a 2018 pre-surgical MRI that showed similar arthritic changes in her AC joint. Dr. Petty acknowledged that the pre-surgical 2018 MRI showed a worsening of her tendinitis. He testified, however, that the worsening "could be presumed to be due to the work injury, but had there not been a work injury, you might have seen the same thing because it's been five years, and tendinitis that's chronic will look a little worse five years later." Dr. Petty also found it significant that, during the left shoulder surgery performed by Dr. Joyner, there was no full-thickness tear identified and only AC joint arthritis was addressed, which both he and Dr. Joyner agreed was not a work-related condition. Dr. Petty then offered the following testimony with respect to Employee's presentation:

> I'm confused by that. I've probably examined 30- or 50,000 shoulders overall and I – this is an unusual situation for me, so I'm confused by her presentation. One minute it moves this far; another minute it moves that far. I had, at one point, become convinced that she had adhesive capsulitis. Then the next moment, I repeated an exam and it wasn't the same. . . .

> So maybe the significance of it is that normally things have a somewhat logical progression . . . . The only thing that in the end I could really hang my hat on was her acromioclavicular joint is abnormal.

With respect to Dr. Joyner's recommendation for additional surgery, Dr. Petty described it as "nonwork-related." He testified that Employee "had it before this work injury, and it is still here now." He then explained, "[t]he lifting of the [patient's] leg

[1] During the expedited hearing, Employee acknowledged that she saw a physician in 2014 for complaints of left shoulder pain while working as a CNA at a veterans' hospital. In its amended Expedited Hearing Order, the trial court considered this inconsistency but concluded it did not change the court's ultimate determination.

could not have caused arthritis to emerge spontaneously in her [AC] joint. That's a longstanding process that marches along slowly and progressively over time."

During cross-examination, Dr. Petty acknowledged some differences in his interpretation of the 2018 pre-surgery MRI findings versus those of Dr. Joyner. He agreed with Dr. Joyner's assessment that Employee suffered a "new work injury" on December 31, 2017, but he disagreed with Dr. Joyner's subsequent opinions regarding the cause of degenerative changes seen on the 2018 MRI as compared to the 2012 MRI. He also disagreed with Dr. Joyner's conclusion that Employee had suffered a "low grade tear of her rotator cuff" as a result of the work injury. Dr. Petty clarified his opinion as follows:

So what we would presume if there is an exacerbation of her shoulder condition from the 2017 work injury, it is an exacerbation of tendinitis, because no tear was found at either surgery. The gold standard for diagnosing a rotator cuff tear is surgical inspection, and we did not find one in either of the two surgeries she had, so her diagnosis must be rotator cuff tendinitis.

There's no basis – from the intraoperative findings, which should be conclusive and used as the gold standard for diagnostic purposes, there's no basis for concluding she had a tear of her rotator cuff.

Finally, during cross-examination, Dr. Petty acknowledged that Dr. Joyner's treatment recommendation was "a great plan." He explained, "I think he's taking her situation and assessing it with an open mind and coming up with a reasonable and appropriate treatment plan." With respect to whether the surgery is medically necessary, Dr. Petty testified that "when it comes to shoulder pain and nonthreatening pathology like this, [surgery is] an option . . . it's an appropriate option, and it's a great plan."

Following the expedited hearing, the trial court weighed the evidence, including the countervailing expert opinions, and concluded the opinions expressed by the authorized treating physician, Dr. Joyner, were more persuasive as to the primary cause of the need for additional surgery. As a result, the court ordered Employer to provide the additional medical treatment recommended by Dr. Joyner, as well as additional temporary disability benefits. Employer has appealed.

**Standard of Review**

The standard we apply in reviewing the trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2019). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give

7

considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2019).

## Analysis

Employer presented three issues on appeal, which we have consolidated and re-stated as two issues: (1) whether the trial court erred in finding Employee presented sufficient evidence of a compensable work injury and/or an aggravation of her pre-existing left shoulder condition to support an interlocutory order for medical benefits; and (2) whether the trial court erred in awarding and calculating temporary disability benefits.

### Interlocutory Order for Medical Benefits

Generally, to be compensable, an injury must arise primarily out of and in the course and scope of employment and must cause disablement, death, and/or the need for medical treatment of the employee. Tenn. Code Ann. § 50-6-102(14) (2019). Furthermore, "[a]n injury 'arises primarily out of and in the course and scope of employment' only if it has been shown by a preponderance of the evidence that the employment contributed more than fifty percent (50%) in causing the injury, considering all causes." Tenn. Code Ann. § 50-6-102(14)(B).

The aggravation of a pre-existing condition is not compensable unless it can be shown to a reasonable degree of medical certainty that the aggravation arose primarily out of and in the course and scope of employment. Tenn. Code Ann. § 50-6-102(14)(A). Thus, to establish a compensable aggravation of a pre-existing condition, an employee must prove by a preponderance of the evidence that the work accident contributed more than fifty percent in causing the aggravation. *See Miller v. Lowe's Home Ctrs., Inc.*, No. 2015-05-0158, 2015 TN Wrk. Comp. App. Bd. LEXIS 40, at *13 (Tenn. Workers' Comp. App. Bd. Oct. 21, 2015) ("[A]n employee can satisfy the burden of proving a compensable aggravation if: (1) there is expert medical proof that the work accident 'contributed more than fifty percent (50%)' in causing the aggravation, and (2) the work accident was the cause of the aggravation 'more likely than not considering all causes.'"). Under such circumstances, the injured worker is entitled to receive all medical treatment

"made reasonably necessary by [the] accident."  Tenn. Code Ann. § 50-6-204(a)(1)(A) (2019).

However, at an expedited hearing, an employee need not prove each and every element of his or her claim by a preponderance of the evidence to obtain temporary disability or medical benefits but, rather, must come forward with sufficient evidence from which the court can determine that he or she is likely to prevail at a hearing on the merits, consistent with Tennessee Code Annotated section 50-6-239(d)(1).  *See McCord v. Advantage Human Resourcing*, No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *9 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015).  Moreover, to qualify for medical benefits, an employee need not establish that the aggravation of his or her pre-existing condition caused a permanent disability.  *Miller*, 2015 TN Wrk. Comp. App. Bd. LEXIS 40, at *18 ("[A]n aggravation or exacerbation need not be permanent for an injured worker to qualify for medical treatment reasonably necessitated by the aggravation.").

Finally, it is well-established that a "trial judge has the discretion to determine which testimony to accept when presented with conflicting expert opinions."  *Payne v. UPS*, No. M2013-02363-SC-R3-WC, 2014 Tenn. LEXIS 1112, at *18 (Tenn. Workers' Comp. Panel Dec. 30, 2014).  Thus, when medical opinions conflict, as in this case, "the trial judge must obviously choose which view to believe.  In doing so, [the trial judge] is allowed, among other things, to consider the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts."  *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 676 (Tenn. 1991).  When one of those experts is an authorized treating physician, that expert's causation opinion is afforded a presumption of correctness.  Tenn. Code Ann. § 50-6-102(14)(E).  On appeal, the trial court's determinations regarding the weighing of expert opinions are reviewed under an abuse of discretion standard.  *Johnston v. Siskin Steel & Supply Co.*, Nos. 2015-01-0023, 2018-01-0003, 2018-01-0008, 2020 TN Wrk. Comp. App. Bd. LEXIS 23, at *13 (Tenn. Workers' Comp. App. Bd. Mar. 24, 2020).

In the present case, the trial court was faced with two competing expert medical opinions.  The causation opinion of one of those physicians, Dr. Joyner, is entitled to a presumption of correctness as provided in section 50-6-102(14)(E).  Similarly, Dr. Joyner's treatment recommendations are presumed to be medically necessary in accordance with section 50-6-204(a)(3)(H).  To prevail, Employer must show the trial court abused its discretion in accepting the opinions of Dr. Joyner over those of Dr. Petty.

Both Dr. Joyner and Dr. Petty are well-qualified orthopedic specialists who expressed their opinions as to the cause and medical necessity of the need for additional surgery.  However, unlike Dr. Petty, Dr. Joyner had the benefit of seeing the condition of Employee's rotator cuff and AC joint during surgery.  Dr. Joyner characterized his

findings as a "low-grade tear" of the rotator cuff, and he clearly testified his pre-operative diagnoses were confirmed during the first surgery he performed. Dr. Joyner followed Employee as a patient and saw her lack of progress with conservative care firsthand. Finally, Dr. Joyner's opinions are presumed correct unless overcome by a preponderance of the evidence. In short, we conclude the trial court did not abuse its discretion in accepting Dr. Joyner's testimony as to the medical necessity and primary cause of the need for additional surgery over that of Dr. Petty.

*Temporary Disability Benefits*

Employer next asserts the trial court erred in awarding temporary disability benefits because Employee did not offer proof of the "duration of disability" as required by Tennessee law. Employer further argues that because Employee applied for Social Security disability benefits, "her inability to work cannot be *causally connected to a compensable work injury*." (Emphasis in original.)

To qualify for temporary *total* disability benefits, an employee must establish: (1) that he or she became disabled from working due to a compensable injury; (2) that there is a causal connection between the injury and the inability to work; and (3) the duration of the period of disability. *Jones v. Crencor Leasing and Sales*, No. 2015-06-0332, 2015 TN Wrk. Comp. App. Bd. LEXIS 48, at *7 (Tenn. Workers' Comp. App. Bd. Dec. 11, 2015) (*citing Simpson v. Satterfield*, 564 S.W.2d 953, 955 (Tenn. 1978)). An employee's entitlement to temporary total disability benefits ends when the employee either reaches MMI or is able to return to work. *Simpson*, 564 S.W.2d at 955 ("Temporary total disability benefits are terminated either by the ability to return to work or attainment of maximum recovery.").

However, in the present case, the parties acknowledged during the post-trial hearing to address Employer's motion to alter or amend the expedited hearing order that Employee's claim for temporary disability benefits was properly characterized as one for temporary *partial* disability. "In all cases of temporary partial disability, the compensation shall be sixty-six and two-thirds percent (66 2/3%) of the difference between the average weekly wage of the worker at the time of the injury and the wage the worker is able to earn in the worker's partially disabled condition." Tenn. Code Ann. § 50-6-207(2)(A) (2019). The statute does not specify the type of work or the manner in which the partially disabled worker can earn wages but instead provides that, in those circumstances, "the wage the worker is able to earn in the worker's partially disabled condition" is to be deducted from the worker's average weekly wage to calculate the temporary partial disability benefits due the worker. *Id.* Therefore, Employer's arguments with respect to the duration of disability are not relevant to the calculation of temporary partial disability benefits.

In its amended expedited hearing order, the trial court considered additional information offered by Employee as to her ongoing earnings from a part time sales job and amended its order for temporary partial disability benefits accordingly. Employer did not object to or dispute Employee's amended calculation of the weekly compensation rate to account for her ongoing earnings. We conclude the evidence does not preponderate against the trial court's determinations in this regard.

Finally, Employer argues that Employee's efforts to secure Social Security Disability benefits for reasons other than her work injury disqualify her from receiving temporary partial disability benefits. We addressed a similar issue in *Warren v. The Pictsweet Co.*, No. 2017-07-0811, 2019 TN Wrk. Comp. App. Bd. LEXIS 60 (Tenn. Workers' Comp. App. Bd. Oct. 17, 2019), where the employer argued that the employee had failed to secure employment after his work accident but had instead "chosen to rely on Social Security Disability benefits." *Id.* at *5. In rejecting that argument, we explained that "employment after an injury should be considered along with 'whether [the] employee, in light of his [or her] education, abilities, physical and/or mental infirmities, is employable in the open labor market.'" *Id.* at *6 (*quoting Duignan v. Stowers Mach. Corp.*, No. E2018-01120-SC-R3-WC, 2019 Tenn. LEXIS 224, at *25 (Tenn. Workers' Comp. Panel June 19, 2019)). In the present case, we conclude that Employee's current work status, her application for Social Security disability benefits, and her ongoing earnings are relevant considerations, but they are not the only factors affecting her entitlement to temporary partial disability benefits. Instead, the trial court was required to consider whether, in her partially disabled condition prior to a determination of MMI, Employee was entitled to receive temporary partial disability benefits in light of all relevant circumstances. Accordingly, we conclude the evidence does not preponderate against the trial court's determinations at this interlocutory stage of the case.

## Conclusion

For the foregoing reasons, we affirm the trial court's interlocutory order in all respects and remand the case. Costs on appeal are taxed to Employer.

11



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Angel Smith | ) | Docket No. 2018-05-1098 |
| | ) | |
| v. | ) | State File No. 894-2018 |
| | ) | |
| TrustPoint Hospital, LLC, et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Robert V. Durham, Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 6th day of January, 2021.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|---|---|---|---|---|---|
| R. Steven Waldron Arlene Smith | | | | X | arlenesmith@wfptnlaw.com |
| Marcia McShane Nelson Suarez | | | | X | mmcshane@constangy.com nsuarez@constangy.com |
| Ronald McNutt, Attorney, Subsequent Injury and Vocational Recovery Fund | | | | X | ronald.mcnutt@tn.gov |
| Robert V. Durham, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |

*O. Yearwood*

Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov